Andrée Larose
MORRISON, SHERWOOD, WILSON & DEOLA, PLLP
401 N. Last Chance Gulch
P.O. Box 557
Helena, MT  59624
(406) 442-3261
(406) 443-7294 (fax)
alarose@mswdlaw.com

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| J.K. and J.C., on behalf of themselves and on behalf of K.K-R., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> MISSOULA COUNTY PUBLIC SCHOOLS, <br><br> Defendant. | Civil Action No._____ <br><br><br> **COMPLAINT** |

PRELIMINARY STATEMENT

Plaintiffs bring this action to obtain appropriate remedies for Missoula

County Public Schools' failure to meet its affirmative duty to provide K.K.R., a

student with a disability, a free appropriate public education ("FAPE"), as required by the Individuals with Disabilities Education Act, as amended in 2004, ("IDEA"), 20 U.S.C. § 1401, *et seq*.

PARTIES

1.      K.K-R. is a high school student with Autism Spectrum Disorder, without Accompanying Intellectual Impairment (f/k/a Asperger's Disorder) and various mental health diagnoses, including an anxiety disorder.  She was born in 1997 and is 17 years of age.  K.K-R. resides with her parents, J.K. and J.C., in Coeur D'Alene, Idaho.  At all relevant times herein, K.K-R. and her parents were residents of Missoula County, and resided within the geographical boundaries of Missoula County Public Schools.

2.      Defendant Missoula County Public Schools (hereafter "MCPS" or "District") is governed by a Board of Trustees.  MCPS is, and has been at all relevant times herein, a school district duly organized and existing under the laws of the State of Montana, located in the city of Missoula, Missoula County, Montana.  The District is a local educational agency, within the meaning of 20 U.S.C. § 1401(19), 34 CFR § 300.28, responsible for providing a free appropriate public education to K.K-R.  MCPS receives federal funds from the U.S. Department of Education.

JURISDICTION and VENUE

3.      This action arises under the laws of the United States.  This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This Court also has jurisdiction pursuant to 20 U.S.C. § 1415(i) of the IDEA.

4.      Venue in the Missoula Division is proper, as the Plaintiffs have resided in Missoula County at all relevant times herein and Defendant School District is located in Missoula County.

STATUTORY SCHEME

5.      The IDEA (formerly known as the Education for All Handicapped Children Act, P.L. 94-142) was adopted in 1975 and most recently amended in 2004 "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d).

6.      Educational programs for children with disabilities are designed and implemented through an Individualized Education Program ("IEP"), that contains, among other things, statements of the following:  the child's present levels of academic achievement and functional performance; annual goals and short term objectives; the specific educational services to be provided to the child; and the

extent to which the child will be educated in regular education programs. 20 U.S.C. § 1414(d). The IEP is the *modus operandi* of the IDEA.

7.  Pursuant to 20 U.S.C. §§1415(b)(6) and 1415(f)(1), whenever there is a disagreement between the parents and a school district regarding the identification, evaluation, or placement of the child, or the provision of a FAPE to the child, either party may present a complaint to be heard in an impartial administrative proceeding known as a "due process" hearing, conducted by the state educational agency.

8.  As required by the IDEA, the Montana Office of Public Instruction has established an impartial hearing procedure and promulgated administrative rules governing that procedure.

## PROCEDURAL HISTORY

9.  On October 1, 2014, J.K. and J.C. filed a request for a special education due process hearing pursuant to the IDEA, 20 U.S.C. § 1415(b)(6) and (f), and its implementing regulations, 34 C.F.R. §§ 300.507 and 300.508, seeking relief for violations of the IDEA.

10.  State Superintendent of Public Instruction, Denise Juneau, appointed Christopher Manos as hearing officer in this matter on October 15, 2014.

11.  An administrative due process hearing was held pursuant to 20 U.S.C. § 1415 and 34 CFR § 300.511 over a course of fifteen (15) days: January 27-30,

February 11-12, February 24-27, March 2, March 23, March 25, and April 15-16, 2015.  On August 21, 2015, the Hearing Officer rejected Plaintiffs' contention that MCPS had failed to provide K.K-R. a free appropriate public education ("FAPE") and denied Plaintiffs' requests for relief. [Hearing Officer's Decision – Findings of Fact, Conclusions of Law, and Order dated August 21, 2015 attached hereto as Exhibit 1, hereafter referred to as "DP Order"].

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     Plaintiffs have exhausted their administrative remedies under 20 U.S.C. § 1415.

## STANDARD OF REVIEW

13.     A district court reviews *de novo* the appropriateness of a special education program or placement under the IDEA, based on a preponderance of the evidence.  The evidence in an IDEA action consists of the administrative record and any additional evidence allowed by the District Court in its discretion pursuant to 20 U.S.C. § 1415(i)(2)(C) and *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993), *cert denied*, 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41.

## FACTUAL ALLEGATIONS

14.     K.K-R. has experienced social and behavioral difficulties since infancy.  She attended preschool and elementary school at a series of small private schools in the Missoula community.  Throughout her preschool and elementary

school years, K.K-R. experienced social and behavioral difficulties.  She demonstrated a lack of understanding of social cues and norms, lack of awareness of the needs of others, poor boundaries, school avoidance and escape behaviors, and numerous other inappropriate behavioral, social and communicative behaviors.

15.     In October 2003, when K.K-R. was in kindergarten, K.K-R.'s parents had her evaluated by Dr. Terry Reed, a licensed clinical psychologist.  Dr. Reed found that K.K-R. displayed a high level of externalizing behaviors and social deficits and diagnosed her with Attention Deficit Hyperactivity Disorder (ADHD).  By fifth grade, her social problems and school avoidance behaviors were more pronounced, and she was struggling with math.  In October 2008, when K.K-R. was in fifth grade, Dr. Robert Velin, a licensed clinical psychologist, conducted another evaluation.  Dr. Velin diagnosed K.K-R. with a nonverbal learning impairment and a mood disorder.

16.     K.K-R. began attending public school in Missoula County Public Schools in the fall of 2009, when she entered sixth grade.  She attended Meadow Hill Middle School for her 6th, 7th, and 8th grade years (2009-10, 2010-11, 2011-12).  She attended Big Sky High School for 9th grade and a portion of 10th grade (2012-13 and 2013-14 school years).

17.     When J.K. enrolled K.K-R. in Meadow Hill Middle School, she told Principal Nick Carter and School Counselor Laura Briney that K.K-R. had been

psychologically evaluated in 2003 and 2008, and that she had been diagnosed with ADHD and a nonverbal learning disorder.  Neither asked for copies of the evaluations, asked for authorization to access K.K-R.'s records, or advised J.K. that K.K-R. could be evaluated to determine her eligibility for special education services.  When K.K-R. began experiencing difficulties at school in sixth grade, J.K. asked Principal Carter whether special education was an option, to which he replied that she would not qualify.

18.     In May 2010, at the end of K.K-R.'s 6th grade year, K.K-R. wrote a note at school indicating her desire to commit suicide.   Upon being notified of this incident by school authorities, J.K. and J.C. placed K.K-R. at Providence Center, a psychiatric program of St. Patrick's Hospital, for 5 days, after which she was transferred to St. Patrick's Adolescent Partial Hospitalization Program ("APHP"). While in APHP, K.K-R. continued to attend school.  Immediately following this psychiatric hospitalization, J.K. asked MCPS School Counselor Mary Archer if K.K-R. could have a "504."  Although J.K. did not know what "504" meant, she knew another student had been provided supports at school through a "504" after his psychiatric hospitalization a few months previous to this.  On June 8, 2010, K.K-R.'s psychiatrist sent a facsimile to Carter and Archer at Meadow Hill listing K.K-R.'s diagnoses, as follows:  Major Depressive Disorder, recurrent; ADHD,

impulsive and hyperactive type; and Anxiety Disorder NOS, with somatic and generalized features.

19.     At the start of K.K-R.'s 7th grade year, in the fall of 2010, J.K. again requested a "504" for K.K-R., as documented in the school counselor's records. The school counselor was also aware that K.K-R. was under the care of a psychiatrist and was receiving counseling from a private therapist.

20.     Throughout middle school, K.K-R. continued to exhibit social and behavioral problems, often failed to turn in assignments, and earned poor grades that were below her ability level.  She was bullied and teased by peers and had only one friend.  She frequently complained of being ill, and would either stay home from school or call her mother to pick her up during the school day.  In total, she missed the equivalent of 32 school days during 6th grade, 28 school days during 7th grade, and 14 school days in 8th grade.  Knowing that K.K-R.'s physical symptoms were likely somatic in nature, J.K. forced K.K-R. to attend or remain in school more often during 8th grade.

21.     At least beginning in May 2010, there was a reasonable basis for MCPS to suspect K.K-R. was a student with a disability, given her high absenteeism, social and behavioral difficulties at school, relatively poor grades, suicidal ideation (expressed at school), psychiatric hospitalization, multiple psychiatric diagnoses, and MCPS's knowledge that she was under the care of a

psychiatrist and a private therapist, as well as J.K.'s explicit request for school supports by way of a "504."

22.    At no time during K.K-R.'s attendance at Meadow Hill Middle School did MCPS conduct an evaluation to determine if she qualified for special education and related services under the IDEA, and at no time did MCPS notify the parents they could request an evaluation to determine K.K-R.'s eligibility for such services.  Nor did MCPS provide the parents written notice explaining their basis for not evaluating K.K-R. or the basis for Carter's determination that K.K-R. would not qualify for special education services.  Nor did MCPS provide the parents a copy of the IDEA's procedural safeguards which identified, among other procedural rights, the right to request an evaluation and the right to request a hearing to challenge any refusal to conduct an evaluation.

23.    Within the first two weeks of K.K-R.'s attendance at Big Sky High School in the fall of 2012, school personnel suspected she was a student with a disability.  They noticed her school avoidance behaviors, noncompliance and poor academic performance, and identified the need to evaluate K.K-R. to determine whether she qualified for special education and related services.  MCPS's evaluation, however, was limited to considering K.K-R.'s eligibility under Section 504 of the Rehabilitation Act of 1973.  MCPS failed to evaluate K.K-R. to determine her eligibility under the IDEA, even though there was a reasonable basis

to suspect she was a student with an IDEA-qualifying disability at that time.

MCPS also failed to advise K.K-R.'s parents of the existence of the IDEA and the

possibility that K.K-R. could be evaluated to determine if she qualified for special

education and related services under the IDEA.

24.     In January 2013, after K.K-R. continued to experience significant

problems in the school setting, MCPS initiated an IDEA evaluation.  When MCPS

sought parental consent to conduct the evaluation, this was the first knowledge the

notice the parents were given of the existence of the IDEA and the potential that

K.K-R. could be eligible for special education and related services thereunder.

When the evaluation was completed in February 2013, MCPS determined that

K.K-R. qualified as a student with a disability under the category "Serious

Emotional Disturbance."  In March 2013, MCPS developed an Individualized

Education Program ("IEP") for K.K-R.

25.     Throughout the 2012-13 school year, both before and after

implementation of her first IEP, K.K-R. continued to struggle – academically,

behaviorally and socially.  She experienced high anxiety at school that led to

escape and school avoidance behaviors.  She did not interact appropriately with

adults and peers.  During class, she often withdrew into her own world, and drew

pictures rather than attend to the class.  Community and School Counseling and

Treatment services ("CSCT") were available to K.K-R. from the fall of 2012 to the

fall of 2013.  CSCT services were offered on a voluntary basis, not as a required

element of K.K-R.'s education program.  K.K-R. did not consistently access these

services and when she did, she frequently could not identify her feelings or engage

appropriately in the process.  CSCT services but were not effective in enabling

K.K-R. to experience academic, social or behavioral success at school.

26.     On September 23, 2013, shortly after she began her sophomore year at

Big Sky High School, K.K-R. was admitted to Providence Center for increasing

depression, anxiety, and suicidal thoughts.  She remained at Providence Center for

5 days, after which time she was placed in the Adolescent Partial Hospitalization

Program (APHP).

27.     Following recommendations by treating professionals that it would be

unsafe for K.K-R. to return to public school, her parents, at their own expense,

placed her at Yellowstone Boys & Girls Ranch ("YBGR") on October 14, 2013,

where she remained until her discharge on February 18, 2014.

28.     Prior to K.K-R.'s placement at YBGR, Dr. Melissa Neff, licensed

clinical psychologist, evaluated K.K-R. and diagnosed her with, among other

disorders, Autism Spectrum Disorder, Mild, Requiring Support, without

Accompanying Intellectual Impairment, a condition previously identified in the

Diagnostic and Statistical Manual of Mental Disorders IV-TR ("DSM- IV-TR"),

and more commonly known as, Asperger's disorder.  The diagnosis of autism,

made for the first time when K.K-R. was 15 years old, provided valuable insight into her lifelong academic, social, behavioral and communication struggles.  Dr. Neff's written report, completed in November 2014, included several recommendations for K.K-R.'s educational program.  K.K-R.'s parents immediately provided MCPS with a copy of Dr. Neff's evaluation report.

29.     While at YBGR, K.K-R. attended school at Yellowstone Academy ("YA"), located on the YBGR campus.  Her academic program and treatment program were integrated, so that she received immediate therapeutic interventions as needed during the school day, a highly structured residential and day program, and various types of mental health therapy (individual, family and group) several times a week, in which she was required to participate.  YBGR treatment staff also worked with K.K-R. to help her understand her autism diagnosis, how it affected her functioning in life, and what skills she needed to develop to cope with and minimize the effects of her disability.  K.K-R. experienced more academic success at YA than she had ever experienced in public or private school in Missoula.

30.     Following K.K-R.'s discharge from YBGR, MCPS conducted additional assessments of K.K-R. and concluded that K.K-R.'s qualifying disability under the IDEA should be changed from serious emotional disturbance to autism.

31.     Following K.K-R.'s discharge from YBGR, MCPS convened a series of IEP team meetings to develop a new IEP for K.K-R.  The meetings were held February 21, February 26, March 25, April 8, and April 17, 2014.

32.     MCPS did not provide K.K-R. any educational services from the time she returned to Missoula on February 18, 2014 through the end of the 2013-14 school year or during the summer of 2014.  Several times throughout the five IEP meetings, K.K-R.'s parents requested that homebound services be provided on a temporary basis until a complete IEP could be developed.  MCPS did not develop an interim IEP offering homebound or other alternative educational services, nor did MCPS actually provide homebound services.  Special Education Coordinator Virginia Haines said at the fourth IEP meeting, held April 8, 2014, that she would talk with the regional director about the possibility of providing homebound services, but never followed up with K.K-R.'s parents to set up or actually provide homebound services.

33.     By the time of the first IEP meeting February 21, 2014, MCPS adminstrators had determined that K.K-R.'s educational placement would be in a regular public high school in Missoula.  MCPS did not consider, discuss or offer any other educational placement options for K.K-R.  When K.K-R.'s parents inquired about the possibility of MCPS providing services at a therapeutic

boarding school, Haines responded that such a placement could not be considered until all options for educating K.K-R. in Missoula public schools were exhausted.

34.    MCPS's determination of educational placement predated the development of K.K-R.'s IEP.  MCPS's predetermined placement in the regular public high school, and failure to consider any other placement options during the IEP process, denied K.K-R's parents meaningful participation in the IEP process.

35.    MCPS's determination to place K.K-R. in a regular public high school with over 1,000 students was inappropriate for K.K-R. and would have caused her harm.  Her anxiety disorder, sensory issues, poor social cognition, and social and communication skill deficits caused K.K-R. to feel overwhelmed and ostracized in the public high school setting.  Her anxiety in that setting prevented her from being able to make academic or other educational progress.

36.    MCPS lacks a continuum of educational placements for students with disabilities.  Placement options in MCPS are limited to the regular education classroom or a special education classroom within the regular public school setting.  MCPS does not offer any educational services in separate schools, therapeutic day programs, residential facilities or other alternative educational placements.   MCPS does not have any special education classes specifically designed for high school students with a combination of autism or similar social cognition and communication deficits and average or above average intellect,

where such students receive small group instruction to improve their social cognition and learn social skills and communication skills.  MCPS's proposal to place K.K-R. in Sentinel High School, without any specialized program providing small group instruction for students with similar needs, was based on the limits of its currently existing programs, rather than on K.K-R.'s unique needs.

37.     MCPS's proposed IEP was not reasonably calculated to meet K.K-R.'s unique needs and enable her to receive meaningful educational benefit because, among other reasons, it lacked:  1) sufficient goals to address substantial areas of educational need; 2) psychological counseling as a related service; 3) a full day of academic and functional skill instruction; 4) occupational therapy to address her sensory needs; and 5) a behavior support and intervention plan to address school avoidance and noncompliance behaviors.

38.     After five IEP meetings conducted over the course of two months, during which MCPS was not providing any educational services for K.K-R., J.K. and J.C. become convinced that MCPS had not offered and was not willing to offer an IEP and educational placement that met K.K-R.'s educational needs.  At the close of the fifth IEP meeting, held April 17, 2014, K.K-R.'s parents requested that MCPS agree to place K.K-R. in a therapeutic boarding school at school district expense.  Without any team discussion or consideration, Haines rejected the request.

39.     In a letter dated April 18, 2014, K.K-R.'s parents restated their concern that the proposed IEP was not appropriate and again requested that MCPS place K.K-R. in a therapeutic boarding school.  The letter also notified MCPS that they would make the placement and seek reimbursement from MCPS.  After receiving notice from the District that their offer of FAPE and educational placement at Sentinel High School was final, the parents wrote to MCPS again expressing their concern about the inappropriateness of the IEP and requesting educational placement in a residential setting.  On June 13, 2014, the parents sent another letter advising that they had continued to research private placements and had identified Maple Lake Academy in Utah as having a program they believed would meet K.K-R.'s needs.  They notified MCPS they planned to place here there and would seek reimbursement from the District.

40.     J.K. and J.C. placed K.K-R. at Maple Lake Academy ("MLA") July 7, 2014.   MLA is a very small therapeutic boarding school that provides a specialized program for students with autism, nonverbal learning impairment or similar social and communication deficits.  MLA has only 15 female students who reside in a nurturing home-like building and attend classes in the same building. MLA is fully accredited by the Northwest Accreditation Commission and the State of Utah, and aligns its academic program with state graduation requirements. MLA offers specially designed instruction for girls with similar intellectual

abilities and social cognition deficits within a quiet, calming low sensory environment.  MLA provides a high level of structure and therapeutic supports that are integrated across the entire program.  Academics are taught in very small classes with a high staff to student ratio (an average of 5 to 6 students with 1 teacher and 1 support staff person).  MLA's recreational therapy program engages the girls in various activities that require them to learn and practice social, problem solving, communication and self-regulating skills with their peers in real hands-on situations.

41.    K.K-R. remained at MLA until August 28, 2014, one week after the Hearing Officer denied their request that MCPS be held responsible for the non-medical costs of K.K-R.'s educational placement at MLA.

42.    K.K-R. made pronounced academic improvements in performance, along with a vast improvement in her educational and academic confidence.  She was placed on High Honor Roll and earned between a 3.0 and a 3.9 GPA each term.  At MLA, K.K-R. did not engage in school-avoidance behaviors (including somatic complaints) and had a nearly perfect attendance record.  In addition, she learned, practiced, and improved her academic organizational skills, and developed new skills for communicating appropriately in the classroom with her teachers and peers.  K.K-R. also improved in the areas of self-advocating for her academic needs with her teachers.  K.K-R. has become an

engaged, determined, hard-working, and enthusiastic learner in school, and has regained her interest in pursuing higher education and now a career in dentistry. She is enthusiastic about opportunities for her future and dedicated to doing what is necessary to achieve them.

43.     While at MLA, K.K-R. made significant improvements in her social cognition, and social and communication skills.  She learned to try to think about the reasons behind social situations, in order to act socially appropriate or repair a non-conforming social interaction.  She is now able to comfortably generalize her social understanding to a variety of social rituals.  She also learned how to appropriately self-advocate with staff and peers in order to get her needs met while maintaining positive relationships.  At MLA, K.K-R developed respectful and caring relationships with all the girls, and developed strong friendships with four peers.  The social improvements K.K-R made at MLA led to an immense improvement in her self-esteem, followed by a willingness to push through her social anxiety in order to connect, engage, and achieve.  The work K.K-R. did in individual, group, and recreational therapy at MLA provided the connectivity, practice, and reinforcement for all of her successes in the program.

44.     K.K-R.'s family has relocated to Coeur D'Alene, Idaho, where K.K-R. currently attends a very small high school.

## FIRST CLAIM FOR RELIEF – IDEA

Plaintiffs incorporate by reference all allegations in paragraphs 1 through 44 as though fully set forth herein

45.     Student K.K.-R. and her parents J.K. and C.S. are parties aggrieved by the Due Process Order within the meaning of 20 U.S.C. § 1415(i)(2)(A).

46.     The Hearing Officer erred in holding that claims for violations of the IDEA that occurred prior to October 1, 2012 were barred by the applicable two year statute of limitations.

47.     The Hearing Officer erred in holding that MCPS did not violate its "Child Find" duties under the IDEA by failing to evaluate K.K.-R. and identify her as a student with a disability prior to February 2013.  Consequently, the Hearing Officer also erred in holding that K.K.-R. was not denied a FAPE during middle school and her first year of high school prior to her identification as a student with a disability in February 2013.

48.     The Hearing Officer erred in concluding that MCPS did not deny K.K.-R. a FAPE following her discharge from YBGR on February 18, 2014 and until her placement at MLA in July 2014.

49.     The Hearing Officer erred in concluding that MCPS's proposed 2014 IEP offered a free appropriate public education for K.K.-R.

50.    The Hearing Officer erred in concluding that K.K-R.'s parents are not entitled to reimbursement for the costs of placement at Maple Lake Academy.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that MCPS denied K.K-R. a FAPE, in violation of the IDEA, 20 U.S.C. § 1401 *et seq.*, by failing to evaluate and identify K.K-R. as a student with a disability when she was in middle school;

2.    Declare that MCPS denied K.K-R. a FAPE, in violation of the IDEA, 20 U.S.C. § 1401 *et seq.*, by failing to provide any educational services from February 18, 2014 to July 7, 2014;

3.    Declare that MCPS's proposed 2014 IEP was not reasonably calculated to meet K.K-R.'s unique needs and provide meaningful educational benefit;

4.     Declare that K.K-R.'s educational placement at Maple Lake Academy was proper under the IDEA;

5.    Order MCPS to reimburse the parents' for K.K-R.'s educational placement at Maple Lake Academy from July 2014 until September 2015;

6.    Order MCPS to pay the costs of compensatory education as a remedy for the failure to identify K.K-R. as a student with a disability and provide her with a FAPE in a timely manner prior to February 2013;

6.     Declare that Plaintiffs are the prevailing party;

7.     Award Plaintiffs reasonable attorneys' fees and costs in connection

with the due process proceeding and this federal court action in an amount as

determined in the discretion of this Court as authorized by 20 U.S.C. §1415(i)(3);

8.     Grant such other and further relief as the evidence supports and as this

Court deems just and proper.

Dated this 18th day of September, 2015.


By    /s/ Andrée Larose
           Andrée Larose
           MORRISON, SHERWOOD, WILSON & DEOLA, PLLP
           *Attorney for Plaintiffs*