# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

**J.K. and J.C., on behalf of themselves and on behalf of K.K-R., a minor,**

Plaintiffs,

v.

**MISSOULA COUNTY PUBLIC SCHOOLS,**

Defendant.

Cause No. CV **15-00122-RWA**

**MEMORANDUM & ORDER REGARDING APPEAL OF ADMINISTRATIVE DECISION**

## I.

## INTRODUCTION

K.K-R. was a student in the Missoula County Public Schools ("MCPS") from the fall of 2009 through approximately September 23, 2013. MCPS receives federal funding, and is a Local Educational Agency responsible for providing K.K-R. with a Free and Appropriate Public Education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* On October 1, 2014, J.K. and J.C., as the parents of K.K-R. (mother and adoptive father, respectively), filed a request for a special education due process hearing alleging nine violations of the IDEA by MCPS. The State Superintendent of Public Instruction appointed Christopher Manos as hearing officer. An administrative due process hearing was held over the

1

course of 15 days (between January 27, 2015, and April 16, 2015), and the hearing officer heard testimony from over 30 witnesses and considered over 179 exhibits. In a 60-page decision dated August 21, 2015, the hearing officer concluded that K.K-R. had not been denied FAPE by MCPS, that K.K-R. qualified for IDEA special education services under the category of autism as determined as of June 9, 2014, and that K.K-R.'s IEP was to be updated in a stated period of time and would include a provision for graduation with a regular diploma as well as transition services for K.K-R.

Plaintiffs appeal the hearing officer's decision and in an Amended Complaint filed September 22, 2015, Plaintiffs assert that the hearing officer erroneously concluded: (1) that Plaintiffs' claims that MCPS violated the IDEA prior to October 1, 2012, were barred by the applicable two-year statute of limitations; (2) that MCPS did not violate its "Child Find" duties under the IDEA by failing to evaluate K.K-R. and identify her as a student with a disability, and further that K.K-R. was not denied FAPE during middle school and her first year of high school prior to her identification as a student with a disability in February of 2013; (3) that MCPS did not deny K.K-R. FAPE following her discharge from the Yellowstone Boys and Girls Ranch ("YBGR") on February 18, 2014; (4) that the Individualized Education Program ("IEP") offered by MCPS to K.K-R. in 2014 did not deny K.K-R. FAPE; and (5) that Plaintiffs were not entitled to reimbursement for the costs of K.K-R.'s placement at Maple Lake Academy.[1] MCPS counters that the hearing officer correctly concluded that MCPS did not violate the IDEA and requests that

---

[1] Plaintiffs ask that MCPS be required to reimburse J.K. and J.C. for K.K-R.'s educational placement at Maple Lake Academy from July 2014 until September 2015 and that MCPS be ordered to pay the costs of compensatory education as a remedy for the failure to identify K.K-R. as a student with a disability and provide her with a FAPE in a timely manner prior to February 2013.

the Court affirm the hearing officer's decision and deny Plaintiffs' claim for relief. Counsel for K.K-R. filed the administrative record with this Court on February 19, 2016, and at the request of the parties, briefing on appeal began on April 15, 2016, and was concluded on June 8, 2016. The parties agreed that no additional evidence would be necessary. After a careful review of the record and exhibits from the 15-day due process hearing, the Court finds MCPS did not violate the IDEA. The Plaintiffs' Amended Complaint should, therefore, be dismissed.

## II.

## STANDARD OF REVIEW

Under the IDEA, a school district's obligation to provide a FAPE requires that it must (1) offer students with disabilities an IEP that is designed to (a) address their unique needs and (b) provide them a meaningful educational benefit in the least restrictive environment, and; (2) provide special education and related services that conform to the IEP. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-90, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); 20 U.S.C. § 1401(9). "A parent . . . may file a due process complaint on any of the matters . . . relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child." 34 C.F.R. § 300.507(a)(1). Any party that is "aggrieved" by the decision of the hearing officer may bring a civil action in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). MCPS does not dispute that Plaintiffs have exhausted their administrative remedies as required by 20 U.S.C. § 1415(l)(2).

The standard for reviewing a hearing officer's decision is *de novo. Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). *See also, J.G. v. Douglas Cty. Sch. Dist.*, 552 F.3d 786, 793 (9th Cir. 2008) (In IDEA cases, courts "do not employ a highly

3

deferential standard of review.") However, "complete *de novo* review is inappropriate." *Id.* (internal quotation marks omitted). "Because Congress intended states to have the primary responsibility of formulating each individual child's education, we must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 888 (9th Cir. 2001) (quoting *Rowley*, 458 U.S. at 206-08, 102 S.Ct. 3034). "Due weight" means that this Court "consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (internal quotation marks omitted). The amount of deference appropriate in a particular case is within the reviewing court's discretion. *Id.*, *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). When determining the degree of deference to be given a hearing officer's findings, a particularly important factor is the thoroughness with which they were reached. *Capistrano*, 59 F.3d at 891 ("The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'")

The scope of the civil action is defined by the IDEA, which provides: "the court...(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(i)-(iii). The party challenging the administrative decision bears the burden of demonstrating that the hearing officer's decision should be reversed. *See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010).

**III.**

4

## BACKGROUND

In the case *sub judice*, this Court affords the hearing officer's determinations substantial weight; his decision evinces "careful, impartial consideration of all the evidence and demonstrates [the hearing officer's] sensitivity to the complexity of the issues presented." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993). The due process hearing lasted fifteen days. The hearing officer's 60-page decision includes 30 pages of findings of fact and presents a thorough and accurate factual background as well as a detailed analysis supporting his conclusions. *See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d at 440-41 ("[A] Court treat[s] a hearing officer's findings as thorough and careful when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.") (internal quotation marks omitted); *see also Park ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006).

For the reasons just discussed, this Court adopts the hearing officer's factual findings in their entirety. However, for purposes of providing context for this decision, the Court will provide a summary of the facts. K.K-R. has experienced social and behavioral issues since infancy. At the age of 4, K.K-R. began seeing Andrew Laue ("Laue"), a mental health therapist. Laue diagnosed K.K-R. with adjustment disorder, major depression, Attention Deficit Hyperactivity Disorder ("ADHD"), and anxiety disorder. In 2003, Dr. Terry Reed, a licensed clinical psychologist, evaluated K.K-R. and diagnosed her with ADHD.

In October 2008, K.K-R. was evaluated over a period of three days by Dr. Robert Velin, a licensed clinical psychologist. Dr. Velin describes K.K-R. in his report as a "pleasant [and]

cooperative" "10-year, 11-month old" who "present[ed] with a very interesting set of symptoms."

Dr. Velin identifies his diagnostic impressions as "nonverbal learning impairment of unknown

etiology" and "mood disorder, not otherwise specified," summarizing, in part:

> [K.K-R.] does not meet criteria for a nonverbal learning disability, per se, nor is
> there anything to suggest either Asperger's or Autistic Spectrum Disorder.
>
> In terms of treatment, certainly one would be well advised to understand that
> [K.K-R.] has difficulty reading subtle social cues, and information needs to be
> verbalized rather than presented in a nonverbal fashion in the social real,. She
> does not appear to be a good candidate for medication given the presentation of
> her current symptoms. . .
>
> * * *
>
> Finally, this youngster certainly will benefit from academic accommodations.
> Math will continue to be an area of weakness, and she will likely require tutoring
> in order to maintain the gains in the academic environment (particularly in the
> area of math). Social skills training will also likely be of benefit, as she will tend
> toward misinterpreting social information and being overly sensitive, which
> certainly have been reported by mother.
>
> One could consider pharmacotherapy for the mood disorder, specifically an SSRI,
> but given the mix of symptoms here, and the potential problems with
> antidepressant use in children, including an FDA black box warning for possible
> suicidal ideation, this would need to be approached quite carefully. Should
> mother choose to move in this direction, I strongly recommend referral to a child
> and adolescent psychiatrist.

Exhibit S 77. Dr. Velin did not diagnose K.K-R. with ADHD, Asperger's or Autistic Spectrum

Disorder. Dr. Velin referred K.K-R. to Dr. Aytes, a psychiatrist, who, in 2009, diagnosed K.K-R.

with major depressive disorder, recurrent, ADHD, impulsive and hyperactive-type, anxiety order

not otherwise specified and possible somatoform disorder. Dr. Aytes prescribed ADHD

medication for K.K-R.

J.K. transferred K.K-R. and K.K-R.'s older full biological brother from private school to

the MCPS (Meadow Hill Middle School) in the fall of 2009. This was the start of K.K-R.'s sixth

grade year and her older brother's eighth grade year. Prior to being enrolled in public school in

2009, K.K-R. suffered abuse at the hands of her older brother.[2]  K.K-R. was also struggling with

the recent (2008) murder of her biological father. J.C. adopted K.K-R. in 2014.

J.K. acknowledges receiving Meadow Hill Middle School's Handbook each year, which

handbooks provided, under the heading "SPECIAL EDUCATION SERVICES:"

> All children in Missoula County Public Schools identified as having disabilities
> are entitled to a free, appropriate public education provided in the least restrictive
> environment. This district provides a variety of services, including special
> academic programs and speech services, and occupational and physical therapy
> services. Most children receive these services at their neighborhood schools,
> integrated with their peers. However, through the special education process the
> least restrictive environment may be outside a student's neighborhood school
> where services may be provided in a more specialized and concentrated manner.
> Parents having concerns about their child's eligibility for special education
> services should contact the classroom teacher, the caseworker or the school
> principal.
>
> MCPS is responsible for finding and evaluating children ages 3-21 for any
> disability that might impact a child's ability to learn.
>
> The IDEA Parent-Teacher-Students Association is a Missoula area coalition of
> families, teachers, administrators, and advocates united in an effort to promote
> quality education and services for students having special needs.

Exhibit S 60 (2009-2010 handbook), Exhibit S 61 (2010-2011 handbook), and Exhibit S 62

(2011-2012 handbook). During the 2009/2010 school year, Meadow Hill Middle School

implemented a section 504 plan for K.K-R.'s older brother.

Throughout middle school, K.K-R. did not always complete her assignments on time, her

grades tended to generally decline and she missed numerous days of school. In the final days of

---

[2]  The relationship between K.K-R. and her older brother was described as abusive,
dysfunctional and unhealthy.

her sixth grade year, K.K-R. wrote a letter to a friend indicating her desire to commit suicide. Upon learning of the note, MCPS brought the matter to J.K.'s attention. As a result of the note, K.K-R. was hospitalized in Providence Medical Center for five days and was then transferred to the Adolescent Partial Hospitalization Program at St. Patrick's Hospital. Even though MCPS was aware that K.K-R. was receiving counseling from a private therapist, MCPS also provided K.K-R. access to the District's Comprehensive School and Community Treatment ("CSCT") services during her seventh grade year. A Student Intervention Team ("SIT") met to discuss concerns about K.K-R.'s grades, attendance and self-isolation during her eighth grade year. MCPS did not complete an IDEA evaluation of K.K-R. in middle school because it did not know or have reason to suspect that she was a student with a disability in need of special education and related services.

K.K-R. was identified as a gifted student in seventh grade. As a result, in ninth grade, K.K-R. applied to and was accepted into the Health and Science Academy at Big Sky High School. Although the Health and Science Academy offered a small classroom setting, K.K-R. struggled with its academic rigors. MCPS first attempted to address K.K-R.'s struggles by providing her additional accommodations, such as access to a room to complete her homework, providing access to a counselor and giving K.K-R. additional time on assignments. When those accommodations did not work, MCPS referred K.K-R. to Stacey DeWitt, a licensed clinical professional counselor. DeWitt did a clinical assessment of K.K-R. in October of 2012, and determined K.K-R. was eligible for accommodations to the educational program under section 504 of the Rehabilitation Act of 1973. MCPS developed a section 504 accommodations plan for K.K-R. on November 12, 2012. When the section 504 accommodations plan did not produce the

desired results, MCPS staff referred K.K-R. for an IDEA evaluation. In February 2013, school psychologist Nancy Ventresca concluded, after performing a comprehensive set of assessments and based upon the disabilities exhibited at that time, that K.K-R. met the criteria for the IDEA under a label of emotional disturbance. MCPS convened and held an Individualized Education Program ("IEP")[3] meeting on March 7, 2013, and developed an IEP for K.K-R. J.K. consented to the March 7, 2013, IEP on March 13, 2013.

At the start of K.K-R.'s sophomore year, the MCPS IEP team reconvened on September 4, 2013, and again on September 19, 2013. At the meeting held September 19, 2013, the IEP team discussed K.K-R.'s then recent behaviors regarding class avoidance and interventions to address that issue. K.K-R. was hospitalized on September 23, 2013, at the Providence Medical Center for depression, anxiety and suicidal thoughts. Upon her discharge from Providence Medical Center on September 27, 2013, K.K-R. attended a weekend grief camp and was then placed in an Adolescent Partial Hospitalization Program. MCPS convened a meeting on October 11, 2013, to discuss K.K-R.'s return to school. K.K-R. did not return to MCPS but was instead placed by J.K. at the Yellowstone Boys and Girls Ranch ("YBGR") on October 14, 2013, where she remained until February 18, 2014, when she was discharged due to insurance reasons.

After her hospitalization at Providence Medical Center, psychologist Melissa Neff performed, at the request of J.K., an evaluation of K.K-R. in October of 2013, and in a report dated November 18, 2013, diagnosed K.K-R. for the first time with Autism Spectrum Disorder, Mild, Requiring Support, without Accompanying Intellectual Impairment (a condition commonly

---

[3] The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d)[.]" 20 U.S.C. § 1401(14).

9

referred to as Asperger's disorder). Upon her discharge from YBGR, Neff had suggested that K.K-R. attend Willard Alternative High School in Missoula, but that option was opposed by K.K-R.'s parents.

Upon learning of K.K-R.'s discharge from YBGR, MCPS convened and held several IEP meetings on February 21, 2014, February 26, 2014, March 25, 2014, April 8, 2014, and April 17, 2014. The IEP team explored options for K.K-R. and some of K.K-R.'s private providers gave input to the IEP team. J.K. argued at various of the meetings that she wanted K.K-R. placed in a private therapeutic boarding school at MCPS's expense. A revised IEP was eventually presented to and rejected by J.K. and J.C. Following the April 17, 2014, IEP meeting, MCPS received a letter from K.K-R.'s parents stating they rejected the draft IEP that was presented and discussed at the April 17, 2014, IEP meeting, and provided notice that they intended to place K.K-R. at a private therapeutic boarding school. MCPS responded to K.K-R.'s parents in a letter dated May 5, 2014, entitled "Prior Written Notice regarding Proposed IEP and Offer of FAPE." K.K-R.'s parents rejected the proposed IEP in a letter dated May 10, 2014, and again stated their intent to place K.K-R. in a therapeutic boarding school and to seek reimbursement for this placement from MCPS.

MCPS sent K.K-R.'s parents another letter dated May 21, 2014, restating MCPS's position that it would not pay the costs of residential placement for K.K-R. MCPS then conducted another evaluation of K.K-R. and held an Evaluation Report meeting on June 9, 2014, at which it was determined that K.K-R. qualified for IDEA special education and related services under the category of Autism. MCPS received a letter from K.K-R.'s parents dated June 13, 2014, wherein the parents notified MCPS that they would be placing K.K-R. at Maple Lake

10

Academy. MCPS sent K.K-R.'s parents another letter dated June 24, 2014, once again reiterating that the IEP sent on May 5, 2014, remained MCPS's offer of FAPE, and again denying payment for the costs of residential placement. On June 26, 2014, MCPS sent K.K-R.'s parents a copy of the June 9, 2014, Evaluation Report.

On October 1, 2014, K.K-R.'s parents filed on behalf of K.K-R. a special education due process hearing request with the Office of Public Instruction. Christopher L. Manos was appointed the hearing officer. A due process hearing was held January 27, 28, 29 and 30, 2015, February 11, 12, 24, 25, 26 and 27, 2015, March 2, 23 and 25, 2015, April 14 and 15, 2015. On August 24, 2015, Manos entered his 60-page Findings of Fact and Conclusion of Law concluding that FAPE was not denied to K.K-R. and that she is entitled to enrollment and qualified for IDEA special education and related services under the category of autism as determined as of June 9, 2014.

K.K-R. was admitted to Maple Lake Academy in Utah on July 7, 2014. Maple Lake Academy is a small therapeutic boarding school that has only 15 female students whose intellectual abilities and social cognition deficits are similar to K.K-R.'s. K.K-R. remained at Maple Lake Academy until approximately August 28, 2015. After the hearing officer issued his decision, K.K-R. relocated with her parents to Coeur D'Alene, Idaho, where as of the date of the Amended Complaint, K.K-R. was attending a small high school.

## IV.

## DISCUSSION

**A. Whether MCPS denied K.K-R. a FAPE under the IDEA by failing to evaluate and identify K.K-R. as a student with a disability when she attended Meadow Hill Middle School between the fall of 2009 and the spring of 2012.**

11

K.K-R.'s parents filed their request for a special education due process hearing on

October 1, 2014. The hearing officer concluded that any claims predating October 1, 2012, were

barred because K.K-R.'s parents knew or should have known about the action that forms the

basis of their complaint as early as August of 2009, and that neither of the exceptions found in 20

U.S.C. § 1415(f)(3)(D) were applicable under the facts of this case. K.K-R.'s parents dispute the

hearing officer's conclusion and claim February 14, 2013, the date MCPS first performed an

IDEA evaluation of K.K-R., is the date they discovered the critical facts that form the basis of

their complaint, that their complaint was, therefore, timely, and that MCPS must remedy their

failure to evaluate K.K-R. under the IDEA beginning August 30, 2010, when J.K. alleges that she

asked MCPS counselor Mary Archer about a plan for K.K-R. under section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794.[4]

The hearing officer's findings of facts 41 through 61 are supported by the evidence. They

also support his conclusion that K.K-R.'s parents knew or should have known of their claims as

early as August of 2009. K.K-R. struggled with social and behavioral issues since infancy, had

been seeing Laue since the age 4, and had been evaluated by numerous professionals between the

age of 4 and the fall of 2009, when she began attending Meadow Hill Middle School. Absent an

exception, this Court agrees with the hearing officer that any claims prior to October 1, 2012, are

barred by the two-year limitations period set forth in 20 U.S.C. § 1415(f)(3)(C). *See also*, 34

C.F.R. § 300.507(a)(2) ("The due process complaint must allege a violation that occurred not

---

[4] Plaintiffs do not allege a claim under section 504. As recently explained by the Ninth Circuit in *A.G. v. Paradise Valley Unified School Dist. No.,* 69, 815 F.3d 1195, 1203 (9th Cir. 2016), citing *Mark H. v. Lemahieu,* 513 F.3d 922, 933 (9th Cir. 2008), "a showing that FAPE was denied under the IDEA does not necessarily establish a denial of FAPE under section 504."

12

more than two years before the date the parent . . . knew or should have known about the alleged

action that forms the basis of the due process complaint, or, if the State has an explicit time

limitation for filing a due process complaint under this part, in the time allowed by that State

law[.]") As specifically explained in a case cited by Plaintiffs in their Opening Brief:

> [A]lthough a child's right to special education under the IDEA does not turn on
> parental vigilance, *M.C. [ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397
> (3rd Cir. 1996)], parental vigilance is vital to the preservation and enforcement of
> that right. As we made clear in *D.K.*, claims that are known or reasonably should
> be known to parents must be brought within two years of that "knew or should
> have known" date, and parents may not, without satisfying one of the two
> statutory exceptions, knowingly sit on their rights or attempt to sweep both timely
> and expired claims into a single "continuing violation" claim brought years later.
> *D.K. [v. Abington Sch. Dist.*, 696 F.3d 233, 248 (3rd Cir. 2012)]. Parents are often
> in a position to be forceful advocates for their children and through their vigilance
> and perseverance to help fulfill the IDEA's promise of a free appropriate public
> education. That "cooperative process ... between parents and schools" that results
> from a parent's action, after all, is at the very "core of the statute" itself. *Schaffer
> [ex rel. Schaffer v. Weast*, 546 U.S. 49, 53, 126 S.Ct. 528, 163 L.Ed.2d 387
> (2005)]. Thus the sooner parents start that process and secure appropriate
> intervention and remedial supports after they discover or reasonably should have
> discovered the need for it, the better for the well-being of the child, the goals of
> the school district, and the relationship between the family and school
> administrators.
>
> On the other hand, where parents neither knew nor reasonably should have
> known of the special needs of their child or of the educational system's failure to
> respond appropriately to those needs, the other partner in this endeavor—the
> school district itself—still has its independent duty to identify those needs within
> a reasonable time period and to work with the parents and the IEP team to
> expeditiously design and implement an appropriate program of remedial support.
> 20 U.S.C. § 1412(a)(3); *see also Forest Grove*, 557 U.S. at 245, 129 S.Ct. 2484;
> P.P., 585 F.3d at 738. This is a profound responsibility, with the power to change
> the trajectory of a child's life. Thus, the corollary to *D.K.* is that when a school
> district has failed in that responsibility and parents have taken appropriate and
> timely action under the IDEA, then that child is entitled to be made whole with
> nothing less than a "complete" remedy. *Forest Grove*, 557 U.S. at 244, 129 S.Ct.
> 2484. Compensatory education is crucial to achieve that goal, and the courts, in
> the exercise of their broad discretion, may award it to whatever extent necessary
> to make up for the child's lost progress and to restore the child to the educational

path he or she would have traveled but for the deprivation. *See D.F.*, 694 F.3d at 498–99. In this way, the courts too have an essential function in fulfilling Congress's mandate in the IDEA and enabling each child with special needs to reach his or her full potential.

For these reasons, we hold today that, absent one of the two statutory exceptions found in § 1415(f)(3)(D), parents have two years from the date they knew or should have known of the violation to request a due process hearing through the filing of an administrative complaint and that, assuming parents timely file that complaint and liability is proven, Congress did not abrogate our longstanding precedent that "a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *D.F.*, 694 F.3d at 499 (*quoting M.C.*, 81 F.3d at 397).

*G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625-26 (3rd Cir. 2015). While Plaintiffs in this case are barred from raising claims that arose prior to October 1, 2012, that is not so say that they are not entitled to compensatory education if they prove liability for claims arising after October 1, 2012.

Plaintiffs argue under an exception that the two-year statute of limitations does not apply because MCPS withheld statutorily required information while K.K-R. was in middle school. *See* 20 U.S.C. § 1415(f)(3)(D)(ii).[5] In particular, J.K. claims she requested a 504 plan from Meadow View Middle School in June and August of 2010, but that such request was refused. MCPS staff, including Mary Archer and Nick Carter, the principal at Meadow Hill Middle School during the 2009-2010 school year, did not have any recollection of such a request, and no written documentation that such a request was made exists. This Court could not find any persuasive evidence in the record to contradict the hearing officer's findings that J.K. did not

---

[5] This exception provides that the two-year statute of limitations set forth in § 1415(f)(3)(C) "shall not apply to a parent if the parent was prevented from requesting the hearing due to– . . . (ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent."

14

inquire about K.K-R.'s eligibility for special education during middle school, that MCPS refused

such request, if in fact one was made, or that MCPS withheld statutorily required information.

"[P]laintiffs can satisfy [the exception set forth in § 1415(f)(3)(D)(ii)] only by showing that the

school failed to provide [the parents] with a written notice, explanation, or form specifically

required by the IDEA statutes and regulations. *D.K. v. Abington Sch. Dist.*, 696 F.3d at 246.

Plaintiffs failed to make such a showing in this case.

## B. Whether MCPS failed to meet its affirmative "Child Find" duties and timely evaluate K.K-R. between October 1, 2012, and February of 2013.

Plaintiffs argue that K.K-R's November 12, 2012, section 504 accommodations plan did

not fulfill MCPS's duties under IDEA. Plaintiffs further argue that MCPS's failure to evaluate

K.K-R. until February 14, 2013, and failure to provide an IEP until March of 2013, deprived

K.K-R. of a FAPE.

In order to ensure that all children with disabilities receive a FAPE, school districts have

an obligation to identify and evaluate all students who may need special education services. 20

U.S.C. § 1412(a)(3); 34 CFR § 300.111; *Timothy O. v. Paso Robles Unified School Dist.*, —

F.3d —, 2016 WL 2957215, *2 (9th Cir. May 23, 2016). "This obligation is also known as the

'child find' requirement." *Compton Unified Sch. Dist. v. Addison*, 598 F.3d 1181, 1183 (9th Cir.

2010). Pursuant to this obligation, districts must ensure that:

All children with disabilities residing in the State ... regardless of the severity of
their disabilities, and who are in need of special education and related services, are
identified, located, and evaluated and a practical method is developed and
implemented to determine which children with disabilities are currently receiving
needed special education and related services.

20 U.S.C. § 1412(a)(3)(A). Children with disabilities, as defined by the IDEA, are children who

15

"need[ ] special education and related services." 20 U.S.C. § 1401(3)(A)(ii). Once a child is identified as potentially having a disability, the child "must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services will address the child's individual needs." *Timothy O. v. Paso Robles Unified School Dist.*, 2016 WL 2957215, *2 .

The child find requirement is triggered when a state has reason to suspect that a child may have a disability and that special education services may be necessary to address that disability. *N.G. v. Dist. of Columbia*, 556 F.Supp.2d 11, 25 (D.D.C. 2008) ("The Court begins with the premise that the Child Find obligation extends to all children suspected of having a disability, not merely to those students who are ultimately determined to be disabled."). Whether a school district had reason to suspect that a child might have a disability must be evaluated in light of the information the district knew, or had reason to know, at the relevant time, not in hindsight. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). *See also, E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1006 (9th Cir. 2011).

The evidence on what MCPS staff may have known about K.K-R.'s exact diagnoses and when MCPS staff may have learned of such diagnoses is disputed. For instance, J.K. claims she told Meadow Hill Middle School principal Nick Carter and school counselor Laura Briney at the start of the 2009 school year that K.K-R. had been diagnosed with ADHD and a nonverbal learning disability. Laura Briney did not testify and Nick Carter could not recall such a conversation. J.K. also testified that Nick Carter rejected her inquiry about special education:

A.    . . . In the fall, I recall talking to Mr. Carter, and kind of trying to brainstorm. You know, kind of what about this, what about this, you know, trying to figure out things that might be possible for K.K-R., and I said, "What about special ed?"

16

Q.     And what was his response?

A.     He said she wouldn't qualify for special – special ed. That special ed was for severely handicapped kids and kids who were cognitively impaired.

Nick Carter had no recollection of such conversation and when asked if he had ever told a parent that their child did not qualify for services under IDEA, he testified:

. . . that's not my job as an administrator, as a teacher, whatever. My job is to do what's necessary, and I wouldn't make that decision, anyway. It would be a team process.

While Nick Carter had no recollection of a section 504 accommodations or special education inquiry by J.K., such an inquiry during the fall of 2009[6] would be curious because K.K-R. had four As and 3 Bs the first quarter of that school year and 2 As, 3 Bs and a C- the second quarter, with the C- being in math. Attendance did not appear to be an issue during K.K-R.'s first semester of sixth grade.

As middle school progressed, K.K-R, was provided access to the MCPS's Comprehensive School and Community Treatment and during her eighth grade year, a Student Intervention Team ("SIT") met to discuss K.K-R. and concerns about her attendance and self-isolation. In essence, the Court cannot disagree with the hearing officer's conclusion that while K.K-R. had issues with turning in assignments and attending classes, the teachers, counselors, and staff at Meadow Hill Middle School had no reason to suspect that K.K-R. was in need of special education and related services.

Following middle school, K.K-R. entered the Health and Science Academy at Big Sky

_____

[6] Nick Carter was not the principal at Meadow Hill Middle School during the 2010-2011 or 2011-2012 school years, as he had moved to Big Sky High School, as the dean of students. Nick Carter's recollections of K.K-R. were primarily from her time at Big Sky High School.

17

High School. K.K-R., like many of her peers, struggled with the academic rigors of the Health and Sciences Academy. K.K-R. would later acknowledge that she experienced significant stress in school because she was not able to adequately manage her academic load. MCPS recognized K.K-R.'s struggles and first attempted interventions, such as providing K.K-R. with access to a room to complete her homework, providing K.K-R. with access to a counselor and giving K.K-R. extra time on assignments. When interventions did not work, MCPS staff referred K.K-R. for a clinical assessment, which revealed that K.K-R. was eligible for accommodations under section 504 of the Rehabilitation Act. On November 12, 2012, MCPS developed a section 504 accommodations plan for K.K-R. K.K-R. was also provided access to MCPS's CSCT services.

Not long thereafter, MCPS concluded in early 2013 that K.K-R. needed more support and she was thus referred for an IDEA evaluation on January 22, 2013. In February of 2013, school psychologist Nancy Ventresca performed a comprehensive set of assessments on K.K-R. and concluded, based upon the disabilities exhibited at that time, that K.K-R. qualified for IDEA under a label of emotional disturbance. Ventresca did not suspect or identify K.K-R. as a student with autism. MCPS convened and held an IEP team meeting on March 7, 2013, and developed an IEP for K.K-R. J.K. consented to the proposed IEP on March 13, 2013.

Based upon the evidence, this Court agrees with the hearing officer that Plaintiffs failed to prove that MCPS violated its Child Find duties under the IDEA. While the threshold for suspicion is low, as argued by Plaintiffs, the Court agrees that MCPS had no reason to suspect K.K-R. as a child in need of special education and related services during her middle school years. Shortly after entering the Health and Science Academy at Big Sky High School, MCPS recognized that something was amiss and immediately provided accommodations for K.K-R.

18

When the accommodations proved inadequate, MCPS developed in November of 2012 a section 504 accommodations plan. When the section 504 accommodations plan did not have the desired effects, K.K-R. was referred for an IDEA evaluation in January of 2013. A school psychologist concluded not long thereafter that K.K-R. qualified for IDEA under a label of emotional disturbance. An IEP was developed and consented to on March 13, 2013. In a period of less than six and one-half months, MCPS provided K.K-R. with accommodations, followed by section 504 accommodations, an IDEA evaluation and an IEP that was consented to by J.K. MCPS was proactive in its efforts; MCPS did not violate its Child Find duties under this set of facts.

## C. Whether MCPS provided K.K.-R. with a FAPE.

The IDEA and the corresponding regulations, including 34 C.F.R. § 300, and 34 C.F.R. § 104.33, ensure that eligible children are provided with a FAPE. The Supreme Court has held that a FAPE must provide a "basic floor of opportunity" to disabled students, not a "potential-maximizing education." *Rowley*, 458 U.S. at 201 & n. 23, 102 S.Ct. 3034. In cases brought under § 1415(e)(2), the Court must determine: (1) whether the State complied with the IDEA procedures; and (2) whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Id.* at 206-07.

### 1. MCPS Complied with the IDEA Procedures.

Under the first prong, the Court must determine whether MCPS complied with IDEA procedures developed to facilitate the provision of a FAPE to children. Procedures such as "individualized planning conferences" [including "parent and child involvement" and "a written record of reasonable expectations"] "provide parent involvement and protection to assure that

19

appropriate services are provided to a handicapped child." *Rowley*, 458 U.S. at 208-09. The

failure to develop an IEP in the specified manner is a violation of procedural requirements of the

IDEA, and an indication "the district may have failed to provide a FAPE." *Amanda J.*, 267 F.3d

at 892.

"Not every procedural violation, however, is sufficient to support a finding that the child

in question was denied a FAPE. Technical deviations, for example, will not render an IEP

invalid. On the other hand, procedural inadequacies that result in the loss of educational

opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation

process, or that caused a deprivation of educational benefits, clearly result in the denial of a

FAPE." *Amanda J.*, 267 F.3d at 892 (internal citations and quotations omitted). Only violations

of procedure which fail to provide educational benefit or parental participation constitute a

violation of IDEA.

Plaintiffs argue that MCPS failed to provide any educational services to K.K-R. after

February 18, 2014, that MCPS's oral offer of homebound instructional placement is not an IEP,

and that MCPS had predetermined K.K-R's placement. The Court disagrees on all points.

The March 2013 IEP, which had been approved by J.K., was still in place at Big Sky

High School when K.K-R. was discharged from YBGR on February 18, 2014. Even though

K.K-R. was not technically enrolled in the MCPS system after her discharge from YBGR, MCPS

convened an IEP team meeting within three days of K.K-R.'s discharge. At that time, K.K-R.'s

parents did not want K.K-R. to return to Big Sky High School. They also did not want to send

K.K-R. to Willard Alternative High School. MCPS thus suggested homebound instruction with

a transition into Sentinel High School. K.K.-R.'s parents responded that they did want K.K-R. at

20

Sentinel High School, where K.K-R.'s older brother was a student. Despite concerns expressed by MCPS, K.K-R.'s parents expressed their belief that Hellgate High School would be a better fit for K.K-R. K.K-R.'s parents also expressed their desire that K.K-R. be placed in a private therapeutic boarding school. Starting with the IEP meeting held February 21, 2014, the IEP team discussed various possibilities for transitioning K.K-R. back into the MCPS system. MCPS was offering educational services as early as February 21, 2014, but in short, K.K-R.'s parents resisted everything short of a private therapeutic boarding school.

Plaintiffs also argue that MCPS was required to make its offer of homebound services in writing and that an oral proposal is not an IEP. Plaintiffs' argument misses the mark because the approved IEP from March of 2013 was already in place at the time K.K-R. was discharged from YBGR. As of February 21, 2014, MCPS was seeking to revise the 2013 IEP to fit K.K-R.'s individual needs. With the existing IEP still in place, MCPS's oral offer of homebound for three weeks, and as needed thereafter, did not force K.K-R.'s parents, as they argue, "to choose between a traumatizing return to public school or no school[.]"

Finally, Plaintiffs argue that MCPS approached the 2014 IEP process having already predetermined K.K-R.'s placement. As Plaintiffs correctly argue, parental involvement is encouraged in the development of an IEP because parents have "first hand knowledge" and "a unique perspective of their child's special needs." *Amanda J.*, 267 F.3d at 891. Parents are not denied an opportunity to participate in the development of an IEP where they attend IEP meetings and strongly express their views, despite the fact that school staff may disagree with and fail to adopt parents' input. *See Burilovich v. Bd. of Educ. of Lincoln Consol. Sch*, 208 F.3d 560, 568 (6th Cir. 2000). Where "parents had an opportunity to discuss the plan when it was

21

proposed" and the child's mother "exercised her rights" by contesting a plan, then challenging it legally, there is no procedural violation in this area. *Park*, 464 F.3d. at 1032.

In this case, the evidence does not show that the IEP team had decided K.K-R's placement and program prior to or during the 2014 IEP meetings. On the contrary, the record reflects that MCPS agreed to move K.K-R.'s placement from Big Sky High School to Sentinel, were offering homebound services and were open to considering Hellgate High School; K.K-R.'s parents had rejected Willard Alternative High School. MCPS approach to K.K-R.'s placement was fluid. Additionally, K.K-R.'s parents attended and participated in the IEP meetings, as did various of K.K-R.'s mental health providers, such as Neff and YBGR. The IEP team openly discussed issues relating to placement raised by the parents, Neff and YBGR and they did so without any indication that they had already arrived at a definitive conclusion. The fact that MCPS had thought about K.K-R.'s needs and contemplated changes to the 2013 IEP prior to the 2014 meetings shows preparation, not predetermination. J.K. and J.C. never afforded MCPS the opportunity to provide academic benefit to K.K-R. in the least restrictive environment after her discharge from YBGR. The Court finds no procedural violation on this point. Even if J.K. and J.C. disagreed with the IEPs, MCPS gave them the opportunity to participate and give meaningful input into the process, and adequately informed them of the contents of the IEPs. K.K-R.'s parents did participate fully in the IEP process. MCPS did not violate the IDEA.

## 2. MCPS's Adoption and Implementation of the IEP did not Deprive K.K-R. of Educational Benefit.

Having determined that MCPS sufficiently complied with the IDEA procedures, the second prong of the analysis to determine whether MCPS provided a FAPE requires the Court to

22

determine whether the IEP was reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206-07. An IEP is reasonably calculated to enable the child to receive educational benefit if it provides only some educational benefit. *Id.* at 200. These rules provide for a very low standard, setting a "floor of opportunity." *Id.* The educational benefits cannot be "*de minimis*," but "must be 'likely to produce progress, not regression or trivial educational advancement.'" *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F.*, 118 F.3d 245, 247-48 (5th Cir. 1997). States are not required to maximize the potential of all disabled children commensurate with non-disabled children. *Rowley*, 458 U.S. at 190. In *Rowley*, for example, the Supreme Court determined that a school did provide a deaf child with a FAPE where he was advancing to the next grade, and that the school was not required to provide a sign-language interpreter.

On this issue, courts should not substitute their judgment for that of state and local educators as to whether an IEP is reasonably calculated to proffer a benefit. *Rowley*, 458 U.S. at 207-08. The Supreme Court cautions that "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id.* Moreover, the school's approach may be "reasonably calculated to confer meaningful educational benefits," even though it may be different from the parents' approach. *J.P. v. West Clark Comm. Schs.*, 230 F.Supp.2d 910, 917 (S.D. Ind. 2002). In order to disprove this, parents bear the burden to show that the approach they favor is the only reasonable method for teaching their child. *J.H. v. Henrico County School Bd.*, 395 F.3d 185, 197 (4th Cir. 2005).

Here, the 2013 IEP was created in a cooperative effort by a broad spectrum of concerned parties. Under the 2013 IEP, K.K-R. advanced from ninth to tenth grade, but when implemented,

23

K.K-R. had not yet been diagnosed with autism. The IEP team convened several times during 2014 to revise the 2013 IEP based on K.K-R.'s recent autism evaluation. Schools are only required to follow the law. Schools are not held to the standard that they must provide the best education for disabled students. The IEPs were designed adequately—they provided K.K-R. with educational benefit—and K.K-R.'s parents have not demonstrated that the method they endorse, placement in a private therapeutic boarding school, is the *only* means to provide K.K-R. with educational benefit in the least restrictive environment.

Upon consideration of these factors and in light of the low standard by which a benefit is measured, MCPS provided K.K-R. with educational benefit. In summary, MCPS satisfies both facets of the analysis: it adequately followed IDEA procedure and provided K.K-R. with educational benefit. MCPS did not violate IDEA. Because MCPS did not violate the IDEA, Plaintiffs are not entitled to reimbursement for K.K-R.'s placement at Maple Lake Academy.

**D.     Whether MCPS lacks the required continuum of educational placements.**

Plaintiffs also argue that MCPS lacks the required continuum of educational placements. IDEA mandates that an eligible student with a disability is educated in the least restrictive environment. This means that, to the maximum extent appropriate, students with disabilities, "including children in public or private institutions," are educated with non-disabled students. 20 U.S.C. § 1412(a)(5)(A). Depending on the nature and severity of a child's disability, a child may be instructed in the regular classroom, a specialized classroom, at home, or in a care facility. 20 U.S.C. § 1412(a)(5); *see also,* 34 C.F.R. § 300.115. However, children with disabilities must be educated in the "least restrictive environment ." 20 U.S.C. § 1412(a)(5). The Act allows "removal of children with disabilities from the regular educational environment ... only when the

24

nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The purpose of this requirement is to "mainstream" children with disabilities to the maximum extent possible, reserving more restrictive placements for children with special needs. It is up to the IEP team to determine the least restrictive environment for each student. 34 C.F.R. § 300.116(a).

K.K-R.'s parents argue MCPS lacks the required continuum of educational placements because MCPS did not agree to pay for K.K-R's placement at Maple Lake Academy. Nothing in the IDEA or corresponding regulations require a school to start the process with the most restrictive environment or provide a special, separate program if it can adequately serve the student in a less restrictive placement with consideration of the full range of supplementary aids and services for support. *See* 71 Fed. Reg. 46540, 46588 (Aug. 14, 2006). The U.S. Department of Education instructs that the least restrictive environment "presumes" the first placement option considered is the regular classroom the student would be in if not disabled with supplementary aids and services for support. *Id.*

The evidence in this case demonstrates that MCPS has a continuum of placements available that satisfy 34 C.F.R. § 300.115. The IEP team considered different options, and considered the concerns raised by K.K-R.'s parents. The IEP team determined the least restrictive environment for K.K-R. was a combination of regular and special education courses at Sentinel High School that offered her the ability to interact with regularly developing peers. For the reasons discussed, the hearing officer did not err in concluding that a residential facility was not the least restrictive environment for K.K-R.

## IV.

## CONCLUSION

The Court finds MCPS satisfied the mandates of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*.

The Clerk of Court is directed to enter judgment in favor of MCPS.

IT IS SO ORDERED.

Done and dated in Butte this 29th day of July, 2016.

RICHARD W. ANDERSON
UNITED STATES MAGISTRATE JUDGE